IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CARD ISLE CORPORATION,

    Plaintiff,

         v.

TARIQ FARID, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:21-CV-1971-TWT

## OPINION AND ORDER

This is a case involving the alleged theft of trade secrets, copyright infringement, and breach of contract. It is before the Court on the Defendants' Motion for Summary Judgment [Doc. 129] and the Plaintiff's Motion for Partial Summary Judgment [Doc. 137]. For the following reasons, the Defendants' Motion for Summary Judgment [Doc. 129] is GRANTED in part and DENIED in part, and the Plaintiff's Motion for Partial Summary Judgment [Doc. 137] is DENIED.

## I.    Background

This case involves the alleged theft of intellectual property owned by the Plaintiff Card Isle Corporation. Card Isle is a small technology company that supplies online retailers with coding systems, infrastructure, and support to sell personalized greeting cards on their websites. (Pl.'s Statement of Undisputed Material Facts ¶ 1.) At a high level, Card Isle creates a customized block of source code that a retailer "plugs into" its existing e-commerce

platform, allowing consumers to design, purchase, and print greeting cards without having to leave the retailer's website. (*Id.* ¶ 2.) It is standard practice to use integration code to import functions like the Card Isle greeting card product into a website. (Defs.' Statement of Undisputed Material Facts ¶ 13.) Often, this is accomplished through the use of an "iframe," a computer software tool which embeds content from one website into another website. (Pl.'s Statement of Undisputed Material Facts ¶ 2.) For example, an iframe may be configured to display YouTube videos on an otherwise unaffiliated website, thereby connecting the YouTube functionality to the other website. (Defs.' Statement of Undisputed Material Facts ¶ 13.)

To guide its client retailers through this integration process, Card Isle prepares an "E-Commerce Integration Blueprint" containing an explanation of the relevant components of Card Isle's technology and a unique block of code written for the specific retailer's website. (Pl.'s Statement of Undisputed Material Facts ¶ 3; Defs.' Statement of Undisputed Material Facts ¶¶ 32-33.) The retailer-specific block of code is the only change made to the retailer's code base, and it serves to load two JavaScript libraries onto the retailer's website: the "Card Isle Embed Library" and the "Retailer-Specific Library." (Pl.'s Statement of Undisputed Material Facts ¶¶ 5-6; Donato Dep. at 42:20-43:17.) The Card Isle Embed Library imports the generic functionality associated with Card Isle's product, including the iframe and the ability to select and personalize greeting cards. (Pl.'s Statement of Undisputed Material Facts ¶ 5;

2

Donato Dep. at 44:1-7.) The Retailer-Specific Library is customized for each retailer and is designed to deliver a personalized user experience tailored to the retailer's website. (Pl.'s Statement of Undisputed Material Facts ¶ 6; Card Isle 30(b)(6) Dep. at 58:20-61:10.) Because it would be "unwieldy" to have a single file perform all of this functionality, Card Isle's JavaScript libraries are structured to import other libraries which in turn import still more libraries. (Pl.'s Statement of Undisputed Material Facts ¶ 10.) This structure is common in software coding. (*Id.*)

In order for a computer user to gain access to a particular website, some of the code for that website must run on the user's computer. (*Id.* ¶ 17.) Adam Donato, one of Card Isle's founders and its CEO, explained:

> Whenever any piece of software is provided, the list of instructions are included in it. That list of instructions has to then be able to be interpreted by your computer to be able to use. If it can be interpreted by a computer, it can be interpreted by a human, because humans built the computers. So any time any piece of software is put out into the wild, it is possible to put some effort in and deconstruct it, and see what each of the steps are, what each of the instructions in the software is.

(*Id.*) Most web browsers have a set of "developer tools" that allow people to see the underlying code that is visually representing a website, usually written in the HTML, CSS, or JavaScript programming language. (*Id.* ¶ 18.) To protect the secrecy of its integration code and make it less readable to humans, Card Isle engages in obfuscation and minification of certain portions of the code. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 19.) In broad

3

terms, obfuscation is a process that makes the names of variables irrelevant in source code, whereas minification removes comments and spaces in the source code to make it harder for humans to decipher. (Defs.' Statement of Undisputed Material Facts ¶¶ 65-66.) Although Card Isle obfuscates and minifies the retailer-specific block of code and the Card Isle Embed Library, it did not, at least in this case, perform these security measures on the Retailer-Specific Library. (*Id.* ¶¶ 69-70; Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 19; Defs.' Resp. to Pl.'s Statement of Additional Undisputed Material Facts ¶ 7.) Further, obfuscation and minification can only make it harder, but not impossible, to read and understand computer code. (Defs.' Statement of Undisputed Material Facts ¶ 67.)

On October 14, 2020, Card Isle obtained a copyright for its code base, referred to as "Code Base Version 3." (Card Isle 30(b)(6) Dep. at 68:21-69:20; *id.*, Ex. 2 ¶ 35.) The copyright applies to Card Isle's retailer-specific block of code, the Card Isle Embed Library, and the Retailer-Specific Library. (Card Isle 30(b)(6) Dep. at 149:1-8.) In addition to its copyrighted code, Card Isle considers its technical know-how to be a valuable and unique part of the services it offers to retailers. (Pl.'s Statement of Undisputed Material Facts ¶ 12.) For example, David Henry, a founder and the COO of Card Isle, testified that Card Isle has "fairly complicated knowledge about printers, how they communicate with different devices, [and] how to connect them into a user friendly website experience[.]" (*Id.*) This knowledge allowed Card Isle to

develop in-house software for tracking and elevating the performance of its retailers' inexpensive, consumer-grade printers. (*Id.* ¶¶ 13-14.) Card Isle also considers the combination of its problem-solving approach and its organization of individual pieces of technology to be one of its competitive advantages. (Pl.'s Statement of Additional Undisputed Material Facts ¶¶ 4-5.)

The events giving rise to this case began in the summer of 2019, when Card Isle began exploring a potential business relationship with Defendant Edible Arrangements, LLC and its founder Defendant Tariq Farid.[1] (Defs.' Statement of Undisputed Material Facts ¶ 120.) Edible Arrangements is a franchising business with approximately 1,000 stores that specialize in delivering fresh fruit arrangements and other food and gift items. (*Id.* ¶ 1.) At the time, Edible Arrangements provided customers a card with a customizable message with their orders; however, Card Isle's software promised to expand this capability, offering customers more traditional greeting cards that could be sold for an additional charge. (*Id.* ¶¶ 122-23.) Edible Arrangements ultimately hired Card Isle to integrate its software into Edible Arrangements' e-commerce platform and to roll out the greeting card product to a limited number of Edible Arrangements' franchisees. (*Id.* ¶ 124.)

---

[1] In addition to founding Edible Arrangements, Farid serves as the CEO of its holding company, Edible Brands, LLC. (Defs.' Statement of Undisputed Material facts ¶ 3.)

The parties entered into three written contracts.[2] On May 20, 2019, Card Isle executed a non-disclosure agreement (the "Netsolace NDA") with Netsolace, Inc., a company which provides technology solutions to Edible Arrangements and other franchise businesses. (*Id.* ¶¶ 2, 127.) Farid was the sole owner of Netsolace during the parties' engagement. (Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 44.) Under section 2(c) of the Netsolace NDA, Netsolace agreed to use confidential information for the sole purpose of evaluating products and services in connection with its potential business relationship with Card Isle. (Pl.'s Statement of Undisputed Material Facts ¶ 46.) Except for this permissible purpose, Netsolace could not "use[], disclose[], reproduce[], summarize[], or distribute[]" confidential information. (*Id.*) Section 2(d) further provided that Netsolace "may not reverse engineer, decompile or disassemble any software disclosed to" it. (*Id.* ¶ 48.) On June 3, 2019, after executing the Netsolace NDA and a materially identical non-disclosure agreement with Edible Arrangements, Card Isle shared its E-Commerce Integration Blueprint with Edible Arrangements, containing a block of code written for Edible Arrangements' website and references to the Card Isle Embed Library and the Retailer-Specific Library. (*Id.* ¶¶ 56, 58;

---

[2] Although there was a fourth contract—a non-disclosure agreement between Card Isle and Edible Arrangements executed on May 10, 2019—it is not relevant to any of the claims asserted in this case. (Defs.' Statement of Undisputed Material Facts ¶¶ 128-29.)

Defs.' Statement of Undisputed Material Facts ¶ 36.)

On October 10, 2019, Card Isle and Edible Arrangements entered into a services agreement (the "Services Agreement"), in which Card Isle agreed to provide the "infrastructure and support" for Edible Arrangements franchisees to "sell personalized products[.]" (Services Agreement, at 1.) Section 2(a) of the Services Agreement prohibited Edible Arrangements from using or divulging "non-public information regarding features, functionality and performance" of Card Isle's Service.[3] (*Id.* ¶ 2(a).) Under section 1(a) of the Services Agreement, Edible Arrangements also agreed not to, "directly or indirectly: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to" Card Isle's services or software.[4] (Pl.'s Statement of Undisputed Material Facts ¶ 52.) The final provision at issue in the Services Agreement, the "Termination Provision," permitted either party to terminate the agreement upon 30 days' notice if there was a material breach by the other party. (*Id.* ¶ 54.) Otherwise, at the conclusion of the initial service term, the agreement would automatically renew unless a party requested termination at

---

[3] Collectively, section 2(a) of the Services Agreement and section 2(c) of the Netsolace NDA are hereinafter referred to as the "Confidentiality Provisions."

[4] Collectively, this portion of section 1(a) of the Services Agreement and section 2(d) of the Netsolace NDA are hereinafter referred to as the "Discovery Provisions."

least 30 days before the end of current term. (*Id.* ¶ 53.) The Service Agreement's initial term was due to end on October 10, 2020. (Defs.' Statement of Undisputed Material Facts ¶¶ 148-49.)

The third and final contract, entitled the "Addendum for Extending Card Isle to [I]nclude Customizable Vase Inserts" (the "Vase Addendum"), was executed between Card Isle and Edible Arrangements on January 17, 2020. (*Id.* ¶ 161.) Under the Vase Addendum, Card Isle agreed to create the capabilities needed to sell and print customizable paper inserts for use in Edible Arrangements' vases. (*Id.* ¶¶ 162-64.) Card Isle agreed to waive all "Web Integration development fees," valued at $45,000, in exchange for a mandated rollout of Card Isle printers at all of Edible Agreements' franchisees (the "Rollout Provision"). (*Id.* ¶ 165.) According to the Vase Addendum's penalty provision, Edible Arrangements had to reimburse Card Isle's web integration fees in the amount of $45,000 if the third rollout milestone (i.e., 650 stores) was not met by May 22, 2020, "due to [Edible Arrangements'] failure to mandate Card Isle printer[s] in accordance with its normal and customary procedures for mandating actions by [Edible Arrangements'] Franchisees[.]" (*Id.* ¶¶ 169-70.)

Shortly after agreeing to the Vase Addendum, Edible Arrangements halted its nationwide launch of the Card Isle program, and it failed to meet all of the rollout milestones set forth in the Vase Addendum. (Mboup Dep. at 43:13-20; Pl.'s Statement of Undisputed Material Facts ¶ 64.) According to

Edible Arrangements, this about-face was the result of several concerns it had with Card Isle's business. For instance, Edible Arrangements' President, Cheikh Mboup, testified that Card Isle was not capable of servicing all of Edible Arrangements' franchisees, both in terms of their hardware needs (i.e., printers, ink, and paper) and innovation needs (i.e., offering greeting cards of different sizes with different images). (Mboup Dep. at 37:11-38:15, 45:19-47:4.) Other alleged concerns included Card Isle's perceived lack of access to capital and the risk of Card Isle being acquired by one of Edible Arrangements' competitors. (*Id.* at 49:10-51:11; Reynolds Dep. at 62:17-65:22.) In May 2020, Edible Arrangements requested to terminate the Services Agreement with Card Isle. (Defs.' Statement of Undisputed Material Facts ¶ 180-83.) Card Isle then sent Edible Arrangements an invoice for the $45,000 rollout milestone penalty, which has not been paid to this date. (*Id.* ¶ 184; Mboup Dep. at 43:21-44:18.)

In June 2020, Netsolace's VP of Technology, Sai Padmanaban, began searching for a vendor to replace Card Isle, but Edible Arrangements ultimately tasked Netsolace with building an in-house greeting card solution, now known as "Printible." (Defs.' Statement of Undisputed Material Facts ¶¶ 191-92.) Andrew Soltis, Netsolace's IT Director, supervised the development of Printible, and a Pakistan company called Broadpeak Technologies, which is also wholly owned by Farid, was tasked with writing the code to integrate Printible with Edible Arrangements' website. (*Id.* ¶ 193;

9

Pl.'s Statement of Undisputed Material Facts ¶¶ 94-95.)

Broadpeak proceeded to create three versions of Printible's integration code. (Defs.' Statement of Undisputed Material Facts ¶ 203.) The first two versions, "Iteration #1" and "Iteration #2," were verbatim or near-verbatim copies of Card Isle's copyrighted code. (Defs.' Statement of Undisputed Material Facts ¶¶ 207(a), 208(a).) Iteration #1 existed between August 31 and September 15, 2020, and Iteration #2 existed between September 15 and September 23, 2020. (Defs.' Statement of Undisputed   Material Facts ¶¶ 207, 208.) As even Card Isle's computer science expert, Daniel Steinbrook, acknowledged, there is no evidence that either version was published for customers to use on Edible Arrangements' website. (Steinbrook Dep. at 238:15-21; Orso Rebuttal Report ¶ 8.) Rather, Soltis and Padmanaban testified that only the software developers could access the integration code for internal testing. (Soltis Dep. at 117:11-24; Padmanaban Dep. at 135:22-136:16.) Each time Soltis discovered the copied code, he or Padmanaban admonished the Broadpeak team and ordered them to rewrite the code without using Card Isle's copyrighted material. (Defs.' Statement of Undisputed Material Facts ¶¶ 207(b)-(c), 208(b)-(c); Soltis Dep. at 125:22-126:23.)

The third version of Printible, "Iteration #3," was created by Broadpeak on September 23, 2020. (Pl.'s Statement of Undisputed Material Facts ¶ 210.) By the time Printible was launched on October 7, 2020, Iteration #3 had replaced Iterations #1 and #2 as the operative version of the Printible

integration code. (*Id.* ¶ 210(f).) According to Soltis, he reviewed Iteration #3 to confirm that it was "written from scratch" before approving the launch. (Soltis Dep. at 127:23-128:19; 161:13-19.) Card Isle, however, contends that its code was not completely removed from Edible Arrangements' code base when Printible went live. In support, Card Isle points to Soltis's deposition testimony that: "Card Isle code was supposed to be removed. . . . Whether it was removed or not. I can't speculate." (*Id.* at 168:10-22.) According to an internal Edible Arrangements project log, as of October 16, 2020, the project entitled "Removal of CardIsle Code from EA Site (due to legal reasons)" had a targeted release date of October 20, 2020. (Silber Dep., Ex. 15 at Edible_CIC008018; *see also id.* at 123:14-18.) And on February 18, 2021, Soltis wrote to a colleague about a "kinda big deal Printible integration bug for EA Web"—namely, that "CardIsle code invokes Printible 3 times" when clicking on a particular button. (Soltis Dep., Ex. 20 at Edible_CIC041860.) Soltis later testified that he was "pretty sure [it] was not [his] intent to call it Card Isle code," but rather Printible code. (Soltis Dep. at 167:9-23.)

Card Isle filed suit against Edible Arrangements, Netsolace, and Farid on November 24, 2020, in the United States District Court for the Western District of Virginia. After the case was transferred to this Court, Card Isle filed the operative Second Amended Complaint, asserting five claims for breach of contract, misappropriation of trade secrets, and copyright infringement. (Second Am. Compl. ¶¶ 84-127.) The Second Amended Complaint seeks

compensatory and punitive damages; an injunction to halt the use of, and to force the return of, Card Isle's trade secrets and copyrighted materials; and attorney's fees and pre- and post-judgment interest. (*Id.* at 42-47.) At the close of discovery, the parties filed motions to exclude certain opinions of their respective experts, which the Court has resolved in an order filed contemporaneously with this one. The parties also filed the motions for summary judgment that are the subject of this Order. In a separately filed motion, Farid moves for summary judgment on the grounds that he cannot be held personally liable for copyright infringement and trade secret misappropriation.

## II.   Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### III.   Discussion

The Court begins its discussion with the Defendants' motion for summary judgment and then, as necessary, addresses any unresolved issues raised in Card Isle's motion for partial summary judgment.

### A.  Defendants' Motion for Summary Judgment

#### 1.  Misappropriation of Trade Secrets

Card Isle asserts three trade secrets as the basis for its misappropriation of trade secrets claims: (1) the E-Commerce Integration Blueprint, (2) the underlying functionality referred to by Card Isle's JavaScript libraries, and (3) a "combination of unique pieces," including Card Isle's technical know-how, approach to solving problems, and organization of individual pieces of technology. (Card Isle 30(b)(6) Dep. at 45:7-48:22.) The Defendants argue that each of these alleged trade secrets is available to the public and so are not entitled to trade secret protection.[5] (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 15.) In response, Card Isle argues that the evidence shows it took all reasonable measures to protect the secrecy of its intellectual property. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 29.) And even if the individual

---

[5] The Defendants also argue that Card Isle's misappropriation claims cannot extend to its backend code because no evidence shows the Defendants had access that code. (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., at 14-15.) In response, Card Isle objects to drawing a hard distinction between frontend, backend, and integration code. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 18-19, 30-34.) The Court finds that it need not wade into this technical debate to resolve either of the summary judgment motions.

elements of Card Isle's trade secrets are public, Card Isle claims that the unique combination of those elements qualify as a trade secret. (*Id.* at 32-33.)

While Card Isle asserts separate claims under the Georgia Trade Secrets Act and the Federal Defend Trade Secrets Act, both statutes incorporate the same misappropriation standard. *See Argos USA LLC v. Young*, 2019 WL 4125968, at*5 (N.D. Ga. June 28, 2019). A claim for misappropriation of trade secrets "requires a plaintiff to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Cap. Asset Res. Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998) (quotation marks and citation omitted). A "trade secret" refers to information, without regard to form, such as technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers. O.C.G.A. § 10-1-761(4); *see also* 18 U.S.C. § 1839(3). "To be classified as a trade secret, the information in question (1) must not be readily ascertainable by proper means by persons who can benefit from its use and (2) must be the subject of reasonable efforts to maintain its secrecy." *Leo Publ'ns, Inc. v. Reid*, 265 Ga. 561, 562 (1995) (citing O.C.G.A. § 10-1-761(4)); *see also* 18 U.S.C. § 1839(3).

As to Card Isle's first alleged trade secret—the E-Commerce Integration Blueprint—the Defendants argue that the code for integrating Card Isle's product into a client's website is accessible via a "right click" on any web

14

browser. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 15.) As the Defendants' computer science expert, Alessandro Orso, explained, the content of a webpage rendered in a browser can be accessed and inspected using the developer tools built into most modern web browsers. (Orso Initial Report ¶ 32; *see also* Card Isle 30(b)(6) Dep. at 16:8-23; Donato Dep. at 47:14-48:5.) In the context of the E-Commerce Integration Blueprint, that means "[t]he HTML, CSS, and JavaScript [code] . . . that is passed to the client, in order to visualize what's happening in the user experience, is available to a savvy individual to view through the browser's developer tools." (Card Isle 30(b)(6) Dep. at 18:14-25.) It is axiomatic that source code cannot qualify as a trade secret if it is "known or readily ascertainable to third parties[.]" *Xtec, Inc. v. Cardsmart Techs., Inc.*, 2014 WL 10268426, at *7 (S.D. Fla. May 15, 2014) (examining Florida's similar trade secret statute); *see also Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1273 (11th Cir. 2021) ("[A]spects of computer software that *are* readily ascertainable don't qualify" as trade secrets.).

Card Isle counters that the E-Commerce Integration Blueprint is not "entirely public" simply because portions of it are visible on a user's computer. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 30.) First, Card Isle cites *RoadSync, Inc. v. Relay Payments, Inc.*, 2022 WL 4715656 (N.D. Ga. Sept. 30, 2022), for the proposition that the visibility of code does not remove trade secret protection from the code. (*Id.*). In *RoadSync*, the court discussed the

"well[-]established" distinction between source code and the visible output of a software program: "[t]he latter includes things that any user or passer-by can see, which precludes trade-secret protection. . . . But the former is *not* accessible to a program user, is not readily ascertainable, and is generally considered to be a trade secret." *RoadSync*, 2022 WL 4175656, at *4 (quotation marks, citations, and punctuation omitted). In drawing this distinction, the court emphasized that the *RoadSync* defendants had not identified any information in the plaintiff's source code, as opposed to the plaintiff's outward-facing software, that was "even arguably public." *Id.* By contrast, the Defendants here have produced evidence that Card Isle's code could be made visible to users of Edible Arrangements' website. Thus, the general proposition stated in *RoadSync* does not align neatly with the facts of this case.

Second, Card Isle disputes whether, as the Defendants claim, its own witnesses admitted that the E-Commerce Integration Blueprint is public. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 31.) According to Card Isle, Steinbrook and Henry merely "acknowledged the fact that, in order for a computer user to be able to access a website, certain portions of the code powering that website must run on the user's computer, and tools exist that allow users to view human-readable portions of such code." (*Id.*) Even accepted as true, the Court fails to see how this statement differs from the Defendants' characterization of the evidence. Is Card Isle arguing that some, but not all, of its source code is visible to web users, thus maintaining the rest of the code's

16

secrecy? Or is Card Isle arguing that its code is just one component of the otherwise secret E-Commerce Integration Blueprint? If Card Isle intended to make one of these arguments (or another one altogether), that is not clear from its brief or its citations to the record. On reply, the Defendants argue that the publicly available portion of Card Isle's code "totally encompasses" its alleged trade secret. (Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 8.) That seems to be correct.

Card Isle has not met its burden of showing that the integration code embedded in the Defendant's website was not readily ascertainable. Central to this holding is the phrase "readily ascertainable" in the definition of a trade secret. O.C.G.A § 10-1-761; 18 U.S.C. § 1839. According to Merriam-Webster dictionary, "readily" means "in a ready manner" such as "without hesitating" or "without much difficulty." *Readily*, Merriam-Webster, https://www.merriam-webster.com/dictionary/readily (last visited July 27, 2023). Although the Court has found no Georgia authorities speaking to this issue, other courts have interpreted the word similarly in the context of trade secret statutes. *See, e.g.*, *Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1125 (E.D. Mich. Feb. 20, 2019) ("Trade secrets do not encompass information which is readily ascertainable, *i.e.*, capable of being acquired by competitors or the general public without undue difficulty or hardship." (quotation marks, citation, and punctuation omitted)); *Yeiser Res. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1046 (S.D. Cal. 2017)

(recognizing that sales data may constitute a trade secret if it must be "developed with a substantial amount of time, effort, and money"); *Editions Play Bac, S.A. v. W. Publ'n Co., Inc.*, 1993 WL 541219, at \*4 (S.D.N.Y. Dec. 28, 1993) ("'[R]eadily ascertainable' must be given its common usage meaning, namely, discoverable with a fair degree of ease, without much difficulty." (quotation marks and citation omitted)). It is undisputed that the Defendants' first two attempts to create its own integration software consisted of copying the Plaintiff's product. The copying was obvious to Netsolace's Andrew Soltis. In this sense, the Plaintiff's trade secret claim and the basis of its copyright claim are completely inconsistent.

This analysis is similarly applicable to Card Isle's second alleged trade secret—the underlying functionality referred to by the JavaScript libraries. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 17.) Again, the Defendants claim that the two JavaScript libraries provided to Edible Arrangements—the Card Isle Embed Library and the Retailer-Specific Library—were publicly available at the time of the alleged misappropriation. (*Id.*) As Card Isle's corporate representative testified, a link to the Card Isle Embed Library was included both in a technical document published on Card Isle's website and in the retailer-specific block of code created for Edible Arrangements' website. (Card Isle 30(b)(6) Dep. at 24:19-25:7, 73:13-17, 128:18-22, 130:25-31.) The retailer-specific block of code also contained a link to the Retailer-Specific Library, making it accessible to users of Edible Arrangements' website through

their browser's developer tools. (*Id.* at 24:19-25:7, 56:23-57:23, 70:25-71:9.) Because both of the JavaScript libraries were available online and written in human-readable programming languages, the Defendants reason, they are readily ascertainable and cannot qualify as trade secrets. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 18.)

Card Isle disputes the assertion that its JavaScript libraries are available to the public. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 31.) Citing Donato's deposition testimony, Card Isle argues that the libraries are akin to "a program in a package," importing JavaScript libraries which import other JavaScript libraries in a unique manner. (*Id.* (quoting Donato Dep. at 43:16-17.).) While it is true that Donato described the JavaScript libraries as a program in a package, nothing in his cited testimony suggests that the libraries were hidden from public view. To the contrary, he testified that once added to a retailer's website, the JavaScript libraries can be "deconstruct[ed]," "interpreted," and "understood" by anyone with access to that website. (Donato Dep. at 46:12-48:21.) Even Card Isle admits a few sentences later that "a computer user with specialized skills, knowledge, and experience could view certain human-readable portions of the JavaScript libraries[.]" (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 32.)

The Court turns now to Card Isle's third and final alleged trade secret— the combination of its technical know-how, approach to solving problems, and organization of individual pieces of technology (i.e., the three "unique pieces").

19

The Defendants argue that Card Isle's combination of unique pieces was not secret because its integration method was visible on Edible Arrangements' website. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 19.) In a one-sentence response, Card Isle summarily claims that at least one of the unique pieces—its technical know-how—is valuable, unique, and not public. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 33.)

The Court sees a more fundamental problem with Card Isle's unique pieces than their secrecy, and that is their scope. Neither the Georgia Trade Secrets Act nor the Defense of Trade Secrets Act addresses how specific a trade secret must be to come within the statutes' protection. However, the Restatement (Third) of Unfair Competition requires that a trade secret plaintiff define "the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . and to determine the fact of an appropriation." Restatement (Third) of Unfair Competition § 39 cmt. d (Am. L. Inst. May 2023 update). Federal courts have imported this requirement into the trade secret laws of several states. *See, e.g.*, *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380-81 (6th Cir. 2022) (Kentucky law); *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 53 (1st Cir. 2020) (Puerto Rico law); *IDX Sys. Corp. v. Epis Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (Wisconsin law); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (Illinois law); *Coda Dev. s.r.o. v. Goodyear Tire & Rubber Co.*, 2023

WL 2734684, at *8-9 (N.D. Ohio Mar. 31, 2023) (Ohio law).

In *Caudill*, the Sixth Circuit described the relevant standard as "reasonable particularity." *Caudill*, 53 F.4th at 381 (citation omitted). That is, a trade secret must be defined with enough particularity "to separate the trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade." *Id.* (citation omitted).

> If a plaintiff "effectively assert[s] that all information in or about its [product] is a trade secret," then it brings a case "both too vague and too inclusive," and does not allow a jury to "separate the trade secrets from the other information that goes into any" product in the field.

*Id.* (quoting *IDX Sys.*, 285 F.3d at 583-84). Put differently, "one cannot claim as a trade secret an entire body of knowledge without articulating at least the boundaries within which the secret lies." *Coda Dev.*, 2023 WL 2734684, at *9 (quotation marks and citation omitted). The reasonable particularity standard takes on "special importance" where, as here, the plaintiff claims a trade secret based on a combination of information. *Caudill*, 53 F.4th at 381. "[A] plaintiff asserting a combination trade secret over highly complex technical information cannot merely offer lists of broad technical concepts identifying categories of information without showing which information contained within those categories constituted a trade secret." *Id.* (quotation marks, citation, and punctuation omitted).

Both alone and in combination, Card Isle's unique pieces are too vague and too inclusive to be considered a trade secret. (Pl.'s Br. in Opp'n to Defs.'

Mot. for Summ. J., at 13-14.) At most, Card Isle points to a couple discrete examples in the record to illustrate its know-how, problem-solving approach, and organizational capabilities. For example, there is Card Isle's "fairly complicated knowledge" of printers—"how they communicate with different devices, how to connect them into a user friendly website experience"—which enables Card Isle's clients to print "top quality" greeting cards with consumer-grade printers. (Henry Dep. at 174:5-175:1; *see also* Donato Dep. at 41:21-42:10.) According to Card Isle, it uses this know-how to provide printing support, including custom printing software, to small businesses that are not technologically sophisticated. (Card Isle 30(b)(6) Dep. at 65:15-66:18.) As further evidence of Card Isle's problem-solving and organizational skills, Henry highlighted its use of JavaScript libraries to integrate the greeting card function into existing e-commerce platforms. (Henry Dep. at 175:4-176:18; *see also* Card Isle 30(b)(6) Dep. at 41:23-42:10.)

The trouble for Card Isle is that these few examples do not provide sufficient notice to the Defendants or the Court about the boundaries of its trade secret. Card Isle discusses its printing services and JavaScript libraries not as the full scope of its unique pieces, but as two of an untold number of episodes where it leveraged its know-how and technology to create business solutions for clients. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 13-14.) In listing non-exhaustive examples of vague concepts, Card Isle has not met its burden to articulate the concrete elements of the trade secret with

22

reasonable particularity. The term "know-how" is so broad as to be meaningless, and Card Isle has not identified any precise steps or other components of its problem-solving and organizational processes. *See TLS Mgmt.*, 966 F.3d at 54 (holding that the process for creating a tax recommendation report was not a trade secret where the plaintiff "failed to identify the process with specificity"). In essence, Card Isle is claiming trade secret protection for all information about its software and business, but that makes it impossible to distinguish secret information from matters that may be known in the industry. *See IDX Sys.*, 285 F.3d at 583. Consequently, the Court grants summary judgment to the Defendants on the grounds that Card Isle's combination of unique pieces is too indefinite to qualify as a trade secret under the Georgia Trade Secrets Act and the Defense of Trade Secrets Act. Accordingly, the Defendants' Motion for Summary Judgment should be granted in its entirety as to the Plaintiff's misappropriation of trade secrets claim.

### 2. Copyright Infringement

Next, the Defendants contend that Card Isle's copyright infringement claim cannot withstand summary judgment for three reasons. The first is that Card Isle cannot recover statutory damages or attorney's fees under the Copyright Act because Printible was developed and released before Card Isle registered the copyright for Code Base Version 3. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 22.) Second, the Defendants argue that Iterations #1 and

#2 of Printible were not used to sell any products on Edible Arrangements' website and so did not cause any cognizable damages to Card Isle. (*Id.* at 23.) Third, the Defendants argue that Iteration #3 of Printible, unlike Iterations #1 and #2, was not copied from Code Base Version 3. (*Id.* at 25.) To the extent there is copied material in Iteration #3, the Defendants argue that it is not actionable because it related to unprotectable portions of Card Isle's code. (*Id.*) Card Isle opposes each of these grounds for summary judgment, and the Court addresses them in turn.

Under 17 U.S.C. § 504(a), a copyright owner may elect to recover statutory damages instead of its actual damages and any additional profits of the infringer. However, the Copyright Act forbids an award of statutory damages and attorney's fees where the infringement "commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2). It is undisputed that Card Isle's Code Base Version 3 has an effective copyright date of October 14, 2020. That falls on the same date as Printible's public unveiling and one week after Printible was rolled out to Edible Arrangements' franchisees. The Defendants reason that any infringement must have started before Printible's launch date and thus before the effective date of Card Isle's copyright registration. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 22.) For its part, Card Isle does not dispute the Defendants' timeline of events, nor does it argue that it registered the

copyright for Code Base Version 3 within three months of first publication, as required to seek statutory damages under 17 U.S.C. § 412(2).[6] Instead, Card Isle contends that the Defendants created new versions of Printible after October 14, 2020, and that these new versions qualify for statutory damages as independent acts of infringement. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 36.)

Card Isle's argument, the Court finds, makes the crucial mistake of conflating new and ongoing acts of infringement. With its reference to the "commencement" of infringement, § 412 "presupposes . . . some kind of activity that begins at one time and continues or reoccurs thereafter." *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2018 WL 2009430, at *10 (N.D. Ga. Mar. 14, 2018) (quotation marks and citation omitted). "As a result, every circuit court to have considered this issue has held that the first act of infringement in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412." *Id.* (quotation marks and citation omitted). Here, Soltis testified that in the months after Printible was released, the development team redesigned the user interface,

---

[6] While the parties have not identified the publication date for Code Base Version 3, it must be outside the three-month grace period provided in § 412 since Edible Arrangements began using Card Isle's software as early as the fall of 2019. (Farid Dep., Ex. 7 at 3; Donato Dep. at 163:22-166:17; *id.*, Ex. 24 at 6.) In any event, Card Isle does not invoke the statutory grace period as a reason to preserve its claim for statutory damages.

made performance optimizations, and introduced more greeting card options to the platform. (Soltis Dep. at 26:12-27:25.) Card Isle has not shown how these modifications to Printible were different in kind from the original act of infringement. Nor has Card Isle shown that these modifications contained new material which itself infringed Card Isle's copyrighted code. Accordingly, the Court holds that Card Isle may not recover statutory damages or attorney's fees from the Defendants under the Copyright Act.

The parties next dispute whether Card Isle sustained any other damages from Iterations #1 and #2 of Printible. According to the Defendants, these versions were "early" and "short-lived," available only to employees on the Edible Arrangements/Netsolace testing environment for a total of three weeks. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 23.) In her report, Card Isle's damages expert, Jennifer Vanderhart, used the Defendants' profits as the measure of Card Isle's copyright damages. (Vanderhart Report ¶ 23 (calculating damages as a result of the Defendants' copyright infringement "in the form of unjust enrichment").) But the Defendants assure that Edible Arrangements never sold a greeting card with Iterations #1 or #2 and that consequently, there are no profits to recover from the initial versions of Printible. (*Id.* at 24.) In response, Card Isle criticizes the Defendants for relying on what it calls "speculative" testimony that Iteration #1 and #2 were strictly for internal use. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 37.) However, Card Isle offers no evidence to contradict this fact. Instead, Card Isle generally

26

alleges that the Defendants used, and continue to use, its copyrighted code as the foundation for Printible. (*Id.*)

The parties' positions, as the Court understands them, are not inconsistent with each other. It is possible that Iterations #1 and #2 never went live, and thus never generated revenue, on Edible Arrangements' website and that Iteration #3, which was the version of Printible released to the public, still contains some copyrighted code like its predecessors. On the current record, the Court agrees with the Defendants that there is no evidence of a single sale being made with Iterations #1 or #2. That means Card Isle cannot prove any profits attributable to these initial versions of Printible. The Court thus awards summary judgment to the Defendants to the extent Card Isle is attempting to recover such profits. *See WasteCare Corp. v. Shredderhotline.com Co.*, 2012 WL 12864454, at *8 (N.D. Ga. Sept. 20, 2012) ("According to the undisputed facts, plaintiff cannot meet its burden of proving the infringer's gross revenue from the profit because there was none."). At the same time, Printible's development history, including the existence of earlier, scrapped versions, may be relevant to show that Iteration #3 infringed on Code Base Version 3. The mere fact that no sales were made with Iterations #1 or #2 would not prevent Card Isle from recovering the Defendants' profits associated with Iteration #3.

The Court now considers whether there is sufficient evidence of copyright infringement as to Iteration #3 to survive summary judgment. To succeed on a claim for copyright infringement, a plaintiff must prove

(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). The existence and validity of Card Isle's copyright are undisputed, so the Court focuses on the second prong and its two subparts—factual and legal copying. *See id.* Factual copying occurs when the defendant "actually used" the plaintiff's material. *Id.* (citation omitted). It can be proven either by direct evidence or, more commonly, by indirect evidence "demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *Id.* (citation omitted). Legal copying, on the other hand, occurs when "those elements of the copyrighted work that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Id.* at 1302 (citation and punctuation omitted). "In most cases, a substantial similarity between the allegedly offending program and the protectable, original elements of the copyrighted works establishes actionable copying."[7] *Id.* (quotation marks and citation omitted).

---

[7] Although their names may sound alike, the Court is mindful of the distinction between "probative similarity" and "substantial similarity." "[P]robative similarity is but one of several vehicles to prove copying as a factual matter, whereas substantial similarity is part of the test for legal copying and remains an indispensable element of plaintiff's proof, even in cases in which defendant does not contest factual copying." *Compulife*, 959 F.3d at 1302 n.4.

First, the Defendants argue that Card Isle cannot show factual copying because there are no probative similarities between Iteration #3 and Code Base Version 3. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 26.) In the Eleventh Circuit, "[p]robative similarity requires that an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Dream Custom Homes, Inc. v. Modern Day Constr., Inc.*, 476 F. App'x 190, 192 (11th Cir. 2012). Card Isle, it seems, has all but conceded that it cannot meet this standard.[8] According to Card Isle, the Defendants "did what many plagiarists do and made superficial changes to Card Isle's code while still copying the underlying functionality." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 39.) Because of the visual differences between Printible's and Card Isle's codes, Steinbrook acknowledged that a side-by-side comparison would not "yield obvious similarities[.]" (*Id.*; *see also* Steinbrook Report ¶¶ 13-18; Steinbrook Dep. at 256:11-257:8.) Instead, Steinbrook examined the two blocks of code "to determine if the differences or similarities that [he] saw would be something [he] would expect to see had the two files been developed independently from one another." (Steinbrook Dep. at 253:21-25.) While Steinbrook may have the education and experience required to conduct this analysis, the Court expects that the average layperson does not.

---

[8] As a threshold matter, Card Isle does not claim to have direct evidence of actual copying, and the Defendants do not dispute the obvious fact that they had sufficient access to Code Base Version 3 to copy it.

Still, the Court finds some examples of similarities in Steinbrook's report which might pass muster under the Eleventh Circuit standard. For instance, Steinbrook noted that Printible and Card Isle's software share some of the same CSS style code, which sets the visual aspects of a webpage. (Steinbrook Report ¶¶ 19-20.) Indeed, a juror could easily observe that the values for several properties, including "position," "width," "left," "transition," "-webkit-overflow-scrolling," and "background-color," are identical. (*Id.*) Both Printible and Card Isle also use the same "random" high value (99999999) for their iframe's z-index, which Steinbrook believes "is unlikely to be coincidental." (*Id.* ¶ 20.)

Moreover, circuit courts outside the Eleventh Circuit have defined "probative similarity" to have a broader scope than the average lay observer's point of view. In the Fifth Circuit, for example:

> a jury may find that two works are probatively similar if it finds any similarities between the two works (whether substantial or not) that, in the normal course of events, would not be expected to arise independently in the two works and that therefore might suggest that the defendant copied part of the plaintiff's work.

*Positive Black Talk Inc. v. Cash Money Recs., Inc.*, 394 F.3d 357, 370 (5th Cir. 2004), abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *see also, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018) (same), overruled on other grounds by *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992) (same).

Steinbrook's report is replete with analysis that goes to the heart of this standard. And one of his core conclusions is that Iteration #3 could not have been developed without access to, or at least detailed knowledge of, Code Base Version 3. (Steinbrook Report ¶ 12.) As Steinbrook explains, Iteration #3 replicates the functionality, although not the visual appearance of, Card Isle's code in multiple respects, including how it (1) changes the style of buttons depending on whether the webpage is being viewed on a mobile device or a desktop computer, (2) detects whether a visitor is using the Safari browser on an iOS device, (3) expresses the logic for setting styles like margins and text alignment, and (4) synchronizes checkboxes differently depending on whether the webpage is being viewed on a mobile device or a desktop computer. (Steinbrook Report ¶¶ 12-18.) In the Court's view, this is sufficient evidence of probative similarity to submit the matter to a jury.

Even so, summary judgment of noninfringement may be appropriate if the Defendants can prove they independently created Iteration #3. *See Advanced Tech. Servs., Inc. v. KM Docs, LLC*, 2013 WL 1501476, at *2 (N.D. Ga. Apr. 9, 2013) ("Proof of access and substantial similarity raises only a presumption of copying which may be rebutted by the defendant with evidence of independent creation." (citation and punctuation omitted)). Citing Soltis's testimony, the Defendants contend that Iteration #3 was written from scratch by a different developer, Aleem Shaukat, than Iterations #1 and #2. (Soltis Dep. at 122-1 at 126:21-127:13.) Steinbrook confirmed the existence of the new

31

developer in his report. (Steinbrook Report ¶ 12.) However, other evidence in the record calls into question the Defendants' claim of independent creation. After all, Shaukat worked for the same firm, Broadpeak, as the developer of Printible's earlier, plagiarized versions. (Soltis Dep. at 126:21-127:13.) And Steinbrook testified that Card Isle's code was never fully expunged from Edible Arrangements' code repository, allowing any person with access to the repository to view it. (Steinbrook Dep. at 237:23-238:14.) Further, according to Steinbrook, Shaukat would have needed specific instructions from the Defendants to be able to write Iteration #3 on his own, but there are none in the record. (*Id.* at 71:10-21.) The Court also notes the quick turnaround time between Iterations #2 and #3. Whereas Soltis complained in internal messages about the slow pace of Broadpeak's integration work, Iteration #3 appeared on the testing environment less than a week after Soltis and Padmanaban rejected Iteration #2. (Soltis Dep., Ex. 17 at Edible_CIC035041; *id.* at 135:9-137:17; *id.*, Ex. 15 at Edible_CIC035587; Steinbrook Report ¶ 12; Orso Rebuttal Report ¶ 8.) In light of these factual disputes, the question of whether the Defendants copied or independently created Iteration #3 cannot be answered on summary judgment.

The Defendants also move for summary judgment on the element of legal copying. Legal copying embodies the principle that "[c]opyright infringement occurs only if one copies *protected elements* of a copyrighted work[.]" *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1554 (11th

Cir. 1996). "The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991). To that end, legal copying looks to whether (1) the copied elements of a copyrighted work are original (and thus protectable) and (2) whether the copying was so extensive that it rendered the offending and copyrighted works substantially similar. *See MiTek Holdings*, 89 F.3d at 1554. In evaluating substantial similarity, a court must consider "both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole." *Compulife*, 959 F.3d at 1302 (citation omitted). "Quantitatively insubstantial copying may still be actionable if it is qualitatively substantial." *Id.*

The Eleventh Circuit has adopted a three-step test for differentiating between actionable and *de minimis* forms of copying: (1) abstraction, (2) filtration, and (3) comparison. *See id.* at 1303.

> In order to ascertain substantial similarity under this approach, a court first breaks down the allegedly infringed program into its constituent structural parts—that's abstraction. Next, the court sifts out all non-protectable material—filtration. The last step is to compare any remaining kernels of creative expression with the allegedly infringing program to determine if there is in fact a substantial similarity—comparison.

*Id.* (quotation marks, citations, and punctuation omitted). Although not explicit, Card Isle appears to reject the Eleventh Circuit's

"abstraction-filtration-comparison" test on the grounds that it "isolate[s] and de-contextualize[s]" the evidence. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 38.) Card Isle argues that substantial similarity must instead "be determined based on the work as a whole," but its reliance on *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823 (10th Cir. 1993), is misplaced. (*Id.* at 38-39.) While *Gates Rubber* endorsed comparing the "whole works" to prove copying, it did so in the context of *factual copying*. *Gates Rubber*, 9 F.3d at 832 n.7. *Gates Rubber* went on to confirm that factual copying is necessary but not sufficient to establish liability for copyright infringement; the copyright holder must also prove *legal copying* under the same abstraction-filtration-comparison test adopted by the Eleventh Circuit. *Id.* at 833-34. Card Isle's refusal to engage with this test all but dooms its copyright infringement claim. Even so, the Court will endeavor to apply the test to Code Base Version 3 to determine if the Defendants have copied any protectable elements of the copyrighted code.

Beginning with the abstraction step, the Eleventh Circuit has advised that "if the copyright holder presents the court with a list of features that it believes to be protectable . . . the court need not abstract further such features." *MiTek Holdings*, 89 F.3d at 1555. Here, the Defendants argue, and Card Isle does not dispute, that Steinbrook limited his infringement analysis to six components of Code Base Version 3. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 28; Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 40-43.) Those

components are: (1) changing button styles based on the type of device being used (i.e., mobile device versus desktop computer), (2) detecting whether a visitor is using the Safari browser on an iOS device, (3) setting margins and text alignment based on the particular webpage being rendered (i.e., product versus cart) and the type of device being used, (4) synchronizing checkboxes based on the type of device used, (5) setting the visual properties of a webpage such as size and color, and (6) using an iframe to integrate the greeting card function into the checkout process. (Steinbrook Report ¶¶ 12-21.) As in *MiTek Holdings*, the Court accepts these six components as the full abstraction of Code Base Version 3. *See MiTek Holdings*, 89 F.3d at 1555-56.

Turning to the filtration step, the Eleventh Circuit recognizes several reasons for which material copied from a copyrighted work might be denied protection. The first is based on the distinction between (protectable) expression and (unprotectable) ideas under the Copyright Act. *See Compulife*, 959 F.3d at 1304. That is, an original work is afforded protection only for its expressive elements, not for any "idea, procedure, process, system, method of operation, concept, principle, or discovery" embodied in that work. 17 U.S.C. § 102(b). Second, under the merger doctrine, "some expression may be so intrinsic to the communication of an idea . . . that is considered to have 'merged' into the idea." *Compulife*, 959 F.3d at 1304. So, "where there are sufficiently few ways of expressing an idea, not even the expression is protected by copyright." *Id.* (quotation marks and citation omitted). The third limitation is

35

more obvious: "material taken from the public domain is unprotected, even if incorporated into a copyrighted work." *Id.* Finally, the doctrine of scènes à faire precludes protection where "external factors constrain the choice of expressive vehicle[.]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004). In the computer software context, scènes à faire applies to "the elements of a program [that are] dictated by practical realities—*e.g.*, by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices[.]" *Id.*; *see also Compulife*, 959 F.3d at 1304-05.

The Defendants argue that these principles, applied here, bar copyright protection for all six of the abstracted elements of Code Base Version 3. First, the Defendants contend, and the Court agrees, that Card Isle cannot copyright the idea of changing the style of a button depending on whether a webpage is being viewed on a mobile device or a computer. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 30.) Not only are ideas excluded from the Copyright Act, but Orso stated in his rebuttal report that "it is standard practice to change the look and feel . . . of a website based on the type of device accessing it." (Orso Rebuttal Report ¶ 11.) *See MiTek Holdings*, 89 F.3d at 1557 n.20 (reasoning that the menu design of a computer program was "basically industry standard" and thus was "unoriginal and not entitled to copyright protection"). Card Isle

36

offers no argument, much less evidence or case law, to the contrary.[9] (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 40.)

Second, the Defendants take aim at Card Isle's method for detecting whether a visitor is accessing a webpage from the Safari browser on an iOS device. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 32-33.) Quoting Steinbrook's report, the Defendants argue that Card Isle's expression of this technique "is not unique, and in fact near-identical lines of code can be found in multiple public posts online." (*Id.* (quoting Steinbrook Report ¶ 15).) As explained, copyright protection is available only for the original additions to an author's work, not for elements which are already in the public domain. *See Compulife*, 959 F.3d at 1305 ("The author of a copyrighted code can't obtain protection for . . . standard modes of expression, lest he effectively monopolize an underlying 'idea.'"). Although Steinbrook described the particular code used in Iteration #3 as unnatural, the evidence says otherwise. (Steinbrook Report ¶ 15.) In fact, two of the online posts cited in Steinbrook's report included both

---

[9] To the extent Card Isle claims a copyright in its specific choice of button style (e.g., font and color)—and nothing in the record suggests it does—this is also unprotectable. The buttons were designed to match the style of Edible Arrangements' existing website. (Card Isle 30(b)(6) Dep. at 28:8-19, 60:23-61:10, 121:21-122:6.) Because the buttons' appearance depended on an external factor, the scènes à faire doctrine precludes copyright protection. *See, e.g., Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 277 (S.D.N.Y. 2005) ("[T]he color of the sand is not protectible under the doctrines of merger and/or *scenes a faire* because Psihoyos chose the sand to match the color . . . of the matrix.").

Printible's and Card Isle's formulations of the Safari check. (*Id.*) Moreover, Orso asserted that the functionality behind this code "is standard and exists in most web applications." (Orso Rebuttal Report ¶ 12.) Again, Card Isle does not offer a response to these arguments, leaving the Court no choice but to find this element of Code Base Version 3 unprotectable. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 40-41.)

According to the Defendants, the third element—Card Isle's logic for setting webpage styles like margins and text alignment—is also subject to the scènes à faire doctrine. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 33.) Indeed, even Steinbrook acknowledged that formatting choices depend on practical realities such as the type of webpage being rendered and the type of device being used to access it. (Steinbrook Report ¶ 16.) As Orso clarified in his rebuttal report, any similarities between Iteration #3 and Code Base Version 3 "would be justified because the code (1) is handling the rendering of a page on specific platforms (*e.g.*, mobile) and (2) must preserve the look and feel of the Edible eCommerce web application." (Orso Rebuttal Report ¶ 14.) In response, Card Isle argues that "to the extent similar portions are required to integrate an iFrame component, the use of an iFrame is one of several approaches." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 41.) Not only is this statement vague and largely nonresponsive to the Defendants' argument, but it also conflates what Card Isle claims are two distinct components of Code Base Version 3—the selection of webpage styles and the use of an iframe.

Accordingly, the Court agrees with the Defendants that this portion of Card Isle's code does not merit copyright protection.

The fourth element at issue is Card Isle's method of synchronizing checkboxes depending on whether the webpage is being viewed on a computer or a mobile device. Again, the Defendants argue, citing Orso's rebuttal report, that this technique follows the "common practice of implementing different behaviors when the page is accessed from a mobile device." (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 34 (quoting Orso Rebuttal Report ¶ 15).) Card Isle does not dispute this assertion; to the contrary, it expressly *disclaims* any copyright to the idea of synchronizing checkboxes. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 41.) Instead, Card Isle focuses solely on the factual similarities between its code and Iteration #3, but that says nothing about whether the similarities are actionable under the abstraction-filtration-comparison test. (*Id.*) As a result, the Court concludes that Card Isle's method of synchronizing checkboxes is not protectable by copyright.

Fifth, the Defendants raise merger and scènes à faire arguments as to the CSS properties defined in Card Isle's code. From a factual perspective, the Defendants emphasize that four of the twelve properties in Card Isle's file "are either not present or entirely different in the Printible file." (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 35 (quoting Orso Rebuttal Report ¶ 19).) Meanwhile, the eight analogous properties either use "extremely common

values" or are limited to "a handful of possible values." (Orso Rebuttal Report ¶ 19.) Where, as here, "there are sufficiently few ways of expressing an idea," the merger doctrine precludes copyright protection even for the expression of that idea. *Compulife*, 959 F.3d at 1304 (quotation marks and citation omitted). Similarly, Card Isle's CSS code "simply sets visual aspects, such as size and color, of . . . the web page," which needed to coordinate with the design of Edible Arrangements' existing website. (Steinbrook Report ¶ 19.) So, like the stylistic and formatting elements addressed above, the CSS properties were dictated by external factors and thus are not protectable. (Card Isle 30(b)(6) Dep. at 28:8-19, 60:23-61:10, 121:21-122:6.) Again, none of the counterarguments advanced by Card Isle are relevant to the issue of legal copying. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 42.)

With respect to the sixth and final element of Code Base Version 3, the Defendants argue that the use of an iframe is an unprotectable idea under the Copyright Act. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 35.) Card Isle does not address the expression-idea distinction in its response brief and so concedes the point. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 42-43.) *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed." (citation and punctuation omitted)). At most, Card Isle argues that other similarities between Iteration #3 and Code Base Version 3—specifically the method for synchronizing checkboxes—stem

from each program's iframe-based implementation. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 42-43.) However, Card Isle has not demonstrated that these other alleged similarities are actionable in their own right or in conjunction with the iframe element. In sum, after filtering out the unprotectable material in Code Base Version 3, none of the six elements identified in Steinbrook's report qualify for copyright protection. The Court thus grants summary judgment of noninfringement to the Defendants. *See Compulife*, 959 F.3d at 1306 ("If the defendant demonstrates—at the filtration stage—that it copied only unprotectable material, such that no substantial similarities remain after filtration, the defendant is entitled to summary judgment.").

### 3. Breach of Contract

The Defendants next move for summary judgment on Card Isle's two claims for breach of contract against Edible Arrangements and Netsolace. Card Isle alleges breaches of the Discovery Provisions and the Confidentiality Provisions in both the Services Agreement and the Netsolace NDA as well as the Termination Provision and the Rollout Provision in the Services Agreement and the Vase Addendum, respectively. (Second Am. Compl. ¶¶ 90-93, 99-100.) In Georgia, the elements for breach of contract are (1) the breach and (2) the resultant damages (3) to the party who has the right to complain about the contract being broken. *Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502 (2010). The construction of a contract is a question

of law for the court. O.C.G.A. § 13-2-1. Where the terms of a contract are clear and unambiguous, the court will enforce the contract according to its plain terms. *See NW Parkway, LLC v. Lemser*, 309 Ga. App. 172, 175 (2011). If an ambiguity exists that cannot be resolved using the rules of contract construction, a jury must decide the meaning of the contract. *See id.* "Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." *Id.* at 176 (citation omitted).

Card Isle's first contract claim involves alleged attempts by Edible Arrangements and Netsolace to discover various aspects of Card Isle's software. Under paragraph 1(a) of the Services Agreement, Edible Arrangements agreed not to, directly or indirectly, "reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to" Card Isle's services or software. (Services Agreement ¶ 1(a).) Similarly, the Netsolace NDA forbids Netsolace to "reverse engineer, decompile or disassemble any software disclosed to" it. (Netsolace NDA ¶ 2(d).) As a threshold matter, the Defendants argue that the Discovery Provisions are unenforceable to the extent they operate to restrict competition. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 38.) This argument relies on a selective reading of Georgia's law on restrictive covenants. Under O.C.G.A. § 13-8-56(4),

42

a restriction that lacks time or geographic limits is not considered unreasonable "so long as it promotes or protects the purpose or subject matter of the agreement[.]" Card Isle contends, and the Court agrees, that the Discovery Provisions were intended to further the parties' business relationship by allowing Card Isle to share confidential and proprietary information with Edible Arrangements and Netsolace. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 44.) As a result, the Court determines that the Discovery Provisions are valid and enforceable.

Next, the Defendants argue that Card Isle cannot prove breach because there is no evidence Edible Arrangements or Netsolace engaged in decompiling, disassembling, or reverse engineering of Card Isle's code. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 38.) The Defendants focus on the issue of reverse engineering since Steinbrook did not mention decompiling or disassembling in his report. (*Id.* at 38-39.) Because the term is not defined in the contracts, the Court must discern its meaning. According to the Defendants, the definition of "reverse engineering" comprises two parts: (1) discovery and (2) use of what is discovered. (*Id.* at 39.) Card Isle does not propose any other interpretation of the word. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 44-46.)

According to Black's Law Dictionary, reverse engineering is "[t]he process of discovering how an invention works by inspecting and studying it, esp. by taking it apart in order to learn how it works and how to copy it and

43

improve it." *Reverse-engineering*, Black's Law Dictionary (11th ed. 2019). In *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974), the Supreme Court assigned a similar meaning to the word—"starting with the known product and working backward to divine the process which aided in its development or manufacture." While both of these definitions contain an element of discovery, neither one corroborates the Defendants' argument that the discovery must be *used* in a product or service to constitute reverse engineering. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 41-42.) Nor do the Defendants' cited authorities support the existence of a "use" element. *See Arconic, Inc. v. Universal Allor Corp.*, 2019 WL 12528963, at *9 (N.D. Ga. July 25, 2019) (contrasting the words "reverse engineering" and "readily ascertainable" on the grounds that the former "deals with actual undertakings" and the latter "is theoretical"); *SAS Inst., Inc. v. World Programming Ltd.*, 2015 WL 13750280 (E.D.N.C. Oct. 8, 2015) (reciting jury instructions which do not purport to define "reverse engineering" as the issue had been decided on summary judgment in the case). Accordingly, the Court will apply the definition of "reverse engineering" set forth in Black's Law Dictionary and *Kewanee Oil* to the Discovery Provisions.

In the Court's view, Card Isle has presented ample evidence to create a jury question on the issue of reverse engineering. For example, on August 7, 2020, Soltis wrote to Padmanaban that he had "found this little gem" after "[t]aking apart CardIsle integration": "if I'm lucky enough to split the domain

name just right and figure out that I was invoked from; Canada, change the price to $8!" (Soltis Dep., Ex. 10 at Edible_CIC035396.) When asked about this message at his deposition, Soltis testified that he read through Card Isle's code file "line by line," and he admitted to using developer tools to examine Card Isle's network traffic purportedly for security reasons. (Soltis Dep. at 28:21-30:6, 97:12-98:5.) In an internal message dated November 6, 2020, another Netsolace employee joked that "Andrew [Soltis] has already hacked Card Isle and the call center app." (Soltis Dep., Ex. 19 at Edible_CIC047363.) Again, Soltis stated that his "hacking" activities—i.e., accessing individual cards, messages, and photographs on Card Isle's platform without authentication—were "part of [his] passion for security and . . . all things compliance." (Soltis Dep. at 163:21-164:16.) Steinbrook's report describes other instances in which Netsolace or Edible Arrangements personnel studied Card Isle's software to, in Steinbrook's opinion, uncover and replicate its implementation details. (Steinbrook Report ¶¶ 22-27.) Indeed, many of Soltis's internal communications support that he wanted to "reengineer the [Card Isle] store experience[.]" (Soltis Dep., Ex. 2 at Edible_CIC002506; *see also id.*, Ex. 5 at Edible_CIC039531 ("We want to mimic their integration to keep changes to a minimum for eComm team, but need to be able to build eComm locally and run through the cart"); *id.*, Ex. 7 at Edible_CIC039985 ("Talked to Mudassir about integration, we'll have to do all of it, same as CardIsle").)

The examples cited in Steinbrook's report and in Card Isle's brief do not relate solely to Card Isle's integration code, which the Defendants argue could not be reverse engineered because the code was willingly provided to Edible Arrangements. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 42; *e.g.*, Steinbrook Report ¶¶ 23-24 (discussing Soltis's use of the Card Isle partner login to examine the printing features in Card Isle's store management system).) Nor can Edible Arrangements and Netsolace avoid liability on the grounds that they did not incorporate their discoveries into Printible. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 41-42.) As articulated in Black's Law Dictionary, reverse engineering includes efforts to not only copy but also improve upon another's invention. In sum, the Court denies summary judgment to Edible Arrangements and Netsolace as to their liability under the Discovery Provisions.

The next two contract provisions at issue are the Confidentiality Provisions and the Termination Provision. Whereas the Defendants argue that neither of these provisions was breached as a matter of law, Card Isle does not address them at all—in either its response brief or its own motion for partial summary judgment. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 42-46; Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., at 43-49; Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 14-18.) Card Isle's failure to respond to the Defendants' arguments constitutes abandonment of these claims, and so, the Defendants are entitled to summary judgment as to their liability under the

46

Confidentiality Provisions and the Termination Provision. *See Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.").

Card Isle's final contract claim involves the Rollout Provision, which required Edible Arrangements to outfit its franchisees with Card Isle printers by a specific date or else pay a $45,000 penalty. (Vase Addendum ¶¶ 1-2.) Specifically, the penalty provision applied only if the third milestone was not met by May 22, 2020, "due to [Edible Arrangement's] failure to mandate Card Isle printer[s] in accordance with its normal and customary procedures for mandating actions by [Edible Arrangement's] franchisees[.]" (*Id.* ¶ 2.) It is undisputed that Edible Arrangements did not meet this milestone and that Edible Arrangements did not mandate Card Isle printers among its franchisees. (Silber Dep. at 24:22-25:5; Mboup Dep. at 37:11-38:12.) However, Edible Arrangements argues that fault for the breach lies with Card Isle because it lacked the inventory and capacity to support the launch. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 46 (citing Mboup Dep. at 37:11-38:12, 43:17-20).) Citing *English v. Muller*, 270 Ga. 876 (1999), Edible Arrangements insists that Card Isle cannot manufacture a breach and then sue on it. (*Id.* at 47.) *See English*, 270 Ga. at 876 ("A party to a contract can not cause a breach or delay in compliance by the other, and then set up the breach or delay so

caused as freeing him from the contract.")

The sole evidence in favor of this defense is Mboup's testimony that Card Isle did not have enough printers to outfit all franchisees nationwide. (Mboup Dep. at 37:11-38:12, 43:17-20.) But Mboup could not recall specifically when he came to this apparent realization or what "glitch" prevented Card Isle from servicing Edible Arrangements' entire system. (*Id.* at 38:7-40:3.) By contrast, when asked about the missed rollout milestones, Henry testified that Card Isle had mobilized its supply chain to meet the expected demand but that Edible Arrangements failed to deliver the agreed-upon number of franchisee contracts. (Henry Dep. at 84:4-85:1, 91:3-92:14.) As the Court reads the Vase Addendum, it was Edible Arrangements' obligation to mandate the printers among its franchisees before Card Isle could supply the printers to those franchisees. (Vase Addendum ¶ 1.) *See J & E Builders, Inc. v. R C Dev., Inc.*, 285 Ga. App. 457, 458-59 (2007) ("Where a contract provides for performance of an obligation, the party bound to perform the obligation may be relieved and the obligation waived, where the other party to the contract repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible.") Thus, there is a genuine issue of material fact as to whether Card Isle caused the failure to meet the rollout milestones.

Edible Arrangements also argues that it offered to pay Card Isle the penalty but that Card Isle refused to accept it. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 46-47.) Not so. In response to Mboup's offer to pay the $45,000,

48

Card Isle sent Edible Arrangements an invoice "now due" for that amount on June 11, 2020. (Henry Dep., Ex. 51 at CI-1-0017783.) One day earlier, Henry had also sent an email to an Edible Arrangements employee outlining the terms for an early termination to the Services Agreement, one of which was "[p]rovid[ing] payment for the penalty for failure to hit mandated roll out milestones." (*Id.* at CI-1-0017784.) According to Mboup, Henry was "adamant" that the invoice was not as important as finding ways to continue their partnership, but that did not relieve Edible Arrangements from its obligation to pay. (Mboup Dep. at 131:5-11.) In fact, Mboup himself testified that it was his intent "for [the payment] to go out." (*Id.* at 43:21-44:18.)

The Defendants close their summary judgment motion by arguing that Card Isle cannot recover damages for lost profits on its contract claims. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 47.) In her report, Card Isle's damages expert, Vanderhart, concluded that but for the Defendants' misconduct, Card Isle would have made additional profits in the form of card sales, printer sales, and service fees from Edible Arrangements and its franchisees. (Vanderhart Report ¶¶ 15, 81-86.) For the period from October 2020 (when Printible was launched) through July 2022 (when her report was filed), Vanderhart calculated a total amount of lost profits of $2,122,625 and stated that her damages analysis will need to be updated for trial due to "the ongoing damages Card Isle is likely incurring[.]" (*Id.* ¶¶ 15, 17.) The Defendants contend that Vanderhart's calculations are fatally flawed in three

ways: (1) there is no evidence that Card Isle's lost profits resulted from any alleged breach of contract; (2) it would be unreasonable to allow Card Isle to recover lost profits into perpetuity; and (3) the value of Card Isle's integration code cannot exceed the $45,000 penalty in the Vase Addendum. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 47-50.) The Court addresses each argument in turn.

In Georgia, remote or consequential damages, such as the claim for lost profits in this case, "are not recoverable unless they can be traced solely to the breach of the contract or unless they are capable of exact computation[.]" O.C.G.A. § 13-6-8; *see also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 643-44 (1997) ("Consequential damages . . . may include profits which might accrue collaterally as a result of the contract's performance[.]" (quotation marks and citation omitted)). The Defendants argue that aside from the rollout milestones, the parties fully performed until the end of the Services Agreement's initial term. (Defs.' Br. in Supp. of Defs.' Mot. for Summ. J., at 48.) It was then terminated. There is no other evidence, the Defendants insist, showing that Card Isle lost profits from any other individual breach. (*Id.*) The Court agrees.

## B. Card Isle's Motion for Partial Summary Judgment

In its motion for partial summary judgment, Card Isle largely repeats the same arguments that the Court already accepted or rejected in deciding the Defendants' summary judgment motion. For example, Card Isle contends

that the Defendants infringed its copyrighted code as a matter of law in creating Iterations #1 and #2 of Printible. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 21-22.) As explained, these initial versions are not actionable for lack of damages: Card Isle registered the copyright for Code Base Version 3 too late to seek statutory damages,[10] and there were no profits from Iterations #1 or #2 that could be recovered from the Defendants. Card Isle also argues that Iteration #3 contained elements of copyrighted code when it was launched on Edible Arrangements' website in October 2020. (Reply Br. in Supp. of Pl.'s Mot. for Summ. J., at 5-7.) Again, this argument, and the evidence supporting it, are directed solely at the issue of factual copying; Card Isle completely ignores the other indispensable element of copyright infringement—legal copying.[11] (Reply Br. in Supp. of Pl.'s Mot. for Partial

---

[10] Card Isle again contends that the Defendants created "new and different" versions of Printible following the copyright registration date, which constitute independent acts of infringement under the Copyright Act. (Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 9.) But there remains no evidence to support that the post-launch revisions made to Printible were "widely separate, distinct acts" of infringement. *Mason v. Montgomery Data, Inc.*, 741 F. Supp. 1282, 1286 (S.D. Tex. 1990). Card Isle's own authorities cut against its position. *See May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 193-94 (S.D.N.Y. 2019) (Although the defendant released an allegedly infringing song and then performed the song live and in videos and other media, the court reasoned that the defendant had a strong argument of continuing infringement because the infringing activities "all have one thing in common: the song *We Can't Stop*."); *Mason*, 741 F. Supp. at 1286 ("Plaintiffs' arguments [of multiple infringements] are not acceptable, because Defendants are accused of committing the same activity each time, for the same purpose, and using the same copyrighted material.").

[11] Citing *Gates Rubber*, Card Isle argues that it can establish copyright

51

Summ. J., at 6 ("Steinbrook does not claim that any single piece of evidence, standing alone, constitutes proof of infringement, nor does he assert that any single piece of evidence, standing alone, could be entitled to copyright protection.").) Thus, the Defendants remain entitled to summary judgment on Card Isle's copyright infringement claim.

Nor does Card Isle's summary judgment motion change the outcome of its sole remaining contract claims under the Discovery Provisions. [12] As discussed, there is sufficient evidence to advance Card Isle's claim of reverse engineering to trial, but summary judgment in its favor would be premature. In particular, the Defendants contend that they examined Card Isle's software for allegedly permissible purposes, such as identifying security risks on Edible Arrangements' website. (Defs.' Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 18-19.) Card Isle separately argues that Edible Arrangements and Netsolace

---

infringement by showing (1) the Defendants had access to its copyrighted code and (2) there are probative similarities between Card Isle's and the Defendants' codes. (Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 7.) However, even under *Gates Rubber*, evidence of access and probative similarities is only sufficient to prove factual copying. *See Gates Rubber*, 9 F.3d at 832-33. Card Isle must also prove legal copying to hold the Defendants liable for copyright infringement. *See id.* at 833 ("The court's inquiry does not end with a finding that the defendant copied portions of the plaintiff's program. Liability for copyright infringement will only attach where *protected elements* of a copyrighted work are copied.").

[12] Card Isle also moves for summary judgment on its contract claim under the Rollout Provision, which the Court grants for the reasons stated above. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 18.)

breached the Discovery Provisions by "disassembling" its software. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 16-17.) But this argument relies on the ordinary, dictionary definition of "disassemble," whereas "disassembly" is a term of art in the computer software industry. (*Compare id.*, *and* Defs.' Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 17-18.) *See Rivers v. Revington Glen Invs., LLC*, 346 Ga. App. 440, 442 (2018) ("[T]echnical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." (citation omitted)). In this context, "disassembly" refers to "a procedure for translating [a] machine language program into an assembly language program." *Bateman v. Mnemonic, Inc.*, 79 F.3d 1532, 1539 n.17 (11th Cir. 1996) (citation omitted). Card Isle makes no effort to shoehorn Edible Arrangements' or Netsolace's actions into this narrow, technical definition of "disassemble." (Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 12-13.)

Card Isle raises two other contract claims that were not part of the Defendant's summary judgment motion. The first is that Edible Arrangements "modif[ied], translat[ed], or create[ed] derivative works based on" Card Isle's services or software, in violation of section 1(a) of the Services Agreement. (Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 17-18.) And the second is that Edible Arrangements and Netsolace removed proprietary notices in violation of sections 1(a) and 2(e) of the Services Agreement and the Netsolace NDA, respectively. (*Id.* at 18.) Neither of these claims was pled in the Second

Amended Complaint. (Second Am. Compl. ¶¶ 84-101.) Rather, Card Isle cited only the Discovery Provisions, Confidentiality Provisions, Termination Provision, and Rollout Provision as the bases for its contract claims. (*Id.*)

Nonetheless, Card Isle contends that it satisfied the federal notice pleading standard because it quoted the relevant contract provisions in, and attached the actual contracts to, the operative complaint. (Reply Br. in Supp. of Pl.'s Mot. for Partial Summ. J., at 10-11.) Not so. As a threshold matter, Card Isle did not quote or otherwise reference section 2(e) of the Netsolace NDA anywhere in the Second Amended Complaint. Nor did Card Isle ever suggest that Edible Arrangements breached section 1(a) of the Services Agreement by modifying, or removing copyright notices from, Card Isle's code. Rather, all allegations related to section 1(a) were directed at the Discovery Provision. (Second Am. Compl. ¶¶ 2, 4, 30, 68, 73, 78-79, 86, 90.) At a minimum, a claim for breach of contract must identify "the actual terms of the contract allegedly breached." *Herssein Law Grp. v. Reed Elsevier, Inc.*, 594 F. App'x 606, 608 (11th Cir. 2015) (citation omitted). The Second Amended Complaint did not provide even this modest degree of notice to the Defendants. Because parties are not permitted to raise new claims or new theories of the case on summary judgment, the Court declines to consider Card Isle's previously undisclosed contract claims.[13] *See Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th

---

[13] The Court also denies Card Isle's request to conform the pleadings to the evidence under Rule 15(b). (Reply Br. in Supp. of Pl.'s Mot. for Partial

Cir. 2017); *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1230 (N.D. Ga. 2014).

## IV.   Conclusion

For the reasons sets forth above, the Defendants' Motion for Summary Judgment [Doc. 129] is GRANTED in part and DENIED in part, and the Plaintiff's Motion for Partial Summary Judgment [Doc. 137] is DENIED. The Defendants are entitled to summary judgment on the misappropriation of trade secrets claim and the copyright infringement claim but not as to the breach of contract claim.

SO ORDERED, this ____30th____ day of August, 2023.

THOMAS W. THRASH, JR.
United States District Judge

---

Summ. J., at 11-12 n.7.) "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Dukes*, 852 F.3d at 1046 (citation omitted).